GLADYS J. and Laura J., by and through her Parent and Next Friend, Gladys J., Plaintiffs,

v.

PEARLAND INDEPENDENT SCHOOL DISTRICT, et al., Defendants.

Civ. A. No. G–81–134.

United States District Court, S. D. Texas, Galveston Division.

Aug. 17, 1981.

Sarah Scott, Houston, Tex., Sandra Hale Adams, Advocacy, Incorporated, Austin, Tex., for plaintiffs.

Richard G. Sedgeley, Houston, Tex., for defendants Pearland Independent School District, et al.

C. Ed Davis, Asst. Atty. Gen., Austin, Tex., for defendants Texas Education Agency, et al.

## MEMORANDUM OPINION

HUGH GIBSON, District Judge.

After exhausting their state administrative remedies pursuant to the Education for

All Handicapped Children Act of 1975 (EHCA), 20 U.S.C. § 1401 *et seq.*, in a losing effort to secure what they believe to be an appropriate educational placement for Laura J., a severely and multipli-handicapped adolescent, plaintiffs brought this action under the EHCA, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the fourteenth amendment. Jurisdiction is alleged under 20 U.S.C. § 1415(e)(2), 29 U.S.C. § 794, 42 U.S.C. § 1983, and 28 U.S.C. § 1343(4).

As they did at the administrative level, plaintiffs seek residential placement for Laura J., whose educational needs they contend cannot be met in her current educational placement in the Pearland Independent School District (Pearland). Additionally, they now seek other injunctive and declaratory relief, as well as damages.

The placement question, the sole issue presented administratively, has been severed from other issues in this action for trial on the merits. Fed.R.Civ.P. 42. Initially, plaintiffs applied for a preliminary injunction ordering the change in placement. That application was taken up by the Court on May 13, 1981, in conjunction with a hearing on plaintiffs' motion for a temporary restraining order.[1] Because the placement question was to be submitted for decision largely on the basis of administrative record, with further evidence pertaining only to events subsequent to the administrative hearing, the Court consolidated the hearing of the application for preliminary relief with a trial on the merits of the issue. Fed.R.Civ.P. 65.

Trial was before the Court on June 8 and 9, 1981. The case was argued before the Court, and at the conclusion of arguments the Court ruled in favor of plaintiffs. The Court deferred entrance of an order until the parties had been afforded a reasonable opportunity to submit for consideration an agreed proposed order. The parties being unable to reach such agreement, the Court on July 30, 1981 entered an order requiring Pearland to place Laura J. in a residential facility capable of meeting the special educational needs of severely intellectually impaired schizophrenic children, and specifying further relief.[2] Pursuant to Fed.R. Civ.P. 52(a), the Court now enters this Memorandum Opinion as its findings of facts and conclusions of law in the case.

## I.

Laura J. is the adopted child of Carl and Gladys J. Her early childhood development appeared fairly normal. At approximately age four, however, she began to manifest noticeable functional and behavioral difficulties. Her motor and self-help skills development lagged. She developed an unusual gait in her walk, ate sloppily and "ravenously," and displayed inappropriate, screaming verbalizations. She developed maladaptive behaviors, notably body clapping, picking, scratching, and suffered from apparent seizures. She became increasingly hyperactive and developed attention problems.

Laura's parents, understandably concerned, turned to the medical and educational professions for help. Initially, Laura was seen by a neurologist, who viewed Laura's condition as a seizure disorder and prescribed medication to control it. Later, she was examined by an endocrinologist, who believed her problems to stem from a chemical imbalance and prescribed a variety of medications. For the most part, these early efforts at diagnosing and treating Laura were ineffective.

Laura has been enrolled in special education courses in public school since age six. Her first placement was in a special education class for severely handicapped children administered by DeWalt Special Services in LaPorte, Texas. The educational program was designed to assist Laura in the develop-

1. After a brief hearing on the record, the Court entered a TRO requiring Pearland to move immediately to place Laura J. in an appropriate residential facility geared to meet the special education and related services needs of schizophrenic children.

2. The Court's order of July 30, 1981 is incorporated herein as Appendix A.

ment of self-help skills, improve her attention, and encourage group interaction. From 1975 to 1978 Laura was a special education student in the LaPorte Independent School District. At the time she entered LaPorte ISD, her intellectual functioning was that of a mildly mentally retarded child. LaPorte identified her as trainable mentally retarded (MR), and placed her in a self-contained special education class in an elementary school.

Between 1975 and 1977 Laura progressed at LaPorte in several areas. She acquired toileting skills, her use of nonsensical speech declined, she spoke at times in complete sentences, her eye contact improved, and her hyperactivity declined. In 1978, however, Laura withdrew severely into herself. Upon medical advice, Laura's parents took her to UTMB–Galveston for testing and evaluation. She remained at UTMB in the Psychiatric Behavioral Sciences Division from September 1978 to February 1979. That particular division of UTMB is essentially a psychiatric hospital for acute, acting-out psychotic children, and apparently Laura regressed in this restrictive environment. For the first time, however, a psychological evaluation was performed and Laura was diagnosed as a childhood schizophrenic.[3]

In anticipation of Laura's release from UTMB, Laura's mother spoke with Sarah Oliver, special education director at Pearland ISD, concerning Laura's placement in that district's special education programs. Mrs. J. provided Pearland with all information in her possession concerning Laura's past evaluations and educational programming. Apparently, this did not include the

UTMB diagnosis of schizophrenia, of which Laura's parents were then unaware, although Pearland became aware of that evaluation at some point in time. Relying principally on the previous assessment of Laura J. by the LaPorte ISD, and without further evaluation and testing, Pearland identified Laura as MR and in February 1979 placed her in a self-contained special education class at Shadycrest Elementary School. Chronologically, Laura was significantly older than most of the children in the class, who were between seven and eight years of age.

In the year that followed, Laura's behavior at home deteriorated markedly. She became increasingly withdrawn and incommunicative. At other times she would strike out aggressively at her parents. Her self-care skills seemed to decline, maladaptive behaviors occurred at greater frequency, and her language became increasingly profane. Because of this, Laura's parents came increasingly to doubt whether Laura's placement at Shadycrest was appropriate for her special needs. Finally, in the spring of 1980, Laura's parents placed her in the Texas Elks Foundation for Handicapped Children, a residential diagnostic facility for severely multipli-handicapped children located in Gonzales, Texas.

Laura remained at the Elks facilities for six weeks, undergoing comprehensive, multidisciplinary evaluation and clinical observation. Adaptive behavior measurements performed at the Elks Foundation indicated that Laura had regressed intellectually and adaptively, functioning at the level of a severely mentally retarded child.[4] Dr. Rob-

3. Although unknown to Laura's parents at the time of adoption, Laura apparently was the victim of cerebral hypoxia at birth, resulting in non-specific brain damage. This is the organic basis for Laura's diagnosed psychosis. Her seizure disorder gives rise to speculation that the damage may have occurred in the temporal lobes of the brain, but the exact location of the damage is unknown.

4. Dr. Currie testified that he was unable to use standardized intelligence tests, such as the Stanford Binet Intelligence Test, due to Laura's poor reality contact. An adaptive behavior

measurement, the Peabody Picture Vocabulary Test, indicated that Laura was functioning at the level of a severely mentally retarded child, i. e., a child with an I.Q. less than 30. The same test administered at UTMB in 1975 showed her to be functioning at the intellectual level of a mildly mentally retarded child with an I.Q. equivalent of 78. More recent evaluations by Dr. Dorothy Wong, a consultant psychologist to Pearland ISD, shows Laura's intellectual functioning to be that of a severely mentally retarded child and her adaptive functioning that of a profoundly retarded child.

ert Currie, a psychologist and executive director of the Elks Foundation at the time of Laura's admission, diagnosed Laura as suffering from a childhood psychosis associated with a non-specific organic brain syndrome, in other words, organic childhood schizophrenia. This diagnosis concurred with that previously made at UTMB. Currie recommended that Laura be placed in a 24-hour, year round residential program for schizophrenic children.

Armed with the Elks' report and recommendations, Laura J.'s parents returned to Pearland ISD seeking residential placement for their child. Pearland declined to initiate such a change, believing that it could provide Laura J. with an appropriate education in a six-hour day program augmented by home support. Pearland did propose to initiate a change in Laura's placement in the day program, however, transferring her from Shadycrest to a prevocational program at the high school level.

Laura's parents, dissatisfied with the district's proposal, elected to pursue their state administrative remedies pursuant to the EHCA. On the basis of a lengthy and thorough administrative record, the impartial due process hearing officer below found that Pearland had failed to provide Laura J. with the "free appropriate public education" to which she was entitled, and recommended residential placement. The State Commissioner of Education adopted the recommendation of the hearing officer, and Pearland perfected an appeal to the State Board of Education, which reversed the Commissioner's decision, adopting findings of fact and conclusions of law submitted by Pearland.

Thus, the case of Laura J. is now before this Court. The issues the Court is called upon to decide may be stated quite simply:

(1) Whether Pearland ISD is providing to Laura J. in her current educational placement the "free appropriate public education" to which she is entitled under the EHCA and section 504 of the Rehabilitation Act of 1973; and, if not,

(2) Whether Pearland must contract for the private residential placement of Laura J. to comply with the federal mandate.

The simplicity with which the issues may be defined belies the true complexion of the case. Difficult factual questions are raised in an area of special knowledge and experience into which courts traditionally have been reluctant to intervene. *See Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269, 277 (3rd Cir. 1980). *See also San Antonio School District v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). The federal statutes in question, particularly the EHCA, are of recent vintage, and decisional law is unavoidably in a state of flux as courts struggle for the first time with many of the difficult interpretive questions that have arisen.

In this instance, however, the Court is not "left to flounder in uncertain educational waters." *Battle v. Commonwealth, supra.* The evidentiary record in this case is substantial and illuminating, and while the Court must necessarily traverse troubled waters, it does not set forth upon uncharted seas. For the reasons set forth below, the Court finds that Laura J.'s current educational placement does not provide her with a "free appropriate public education" within the meaning of federal law, and that Pearland must provide for Laura J., at no cost to her parents, residential placement in a facility capable of meeting her unique special education and related services needs.

II.

Like its predecessors, the Education for the Handicapped Act and the Education of the Handicapped Amendments of 1974, the EHCA is a funding statute to assist states in initiating, expanding and improving special education programs. *See, e. g., Loughran v. Flanders,* 470 F.Supp. 110, 114 (D.Conn.1979). Clearly, however, the EHCA is more than a funding statute *simpliciter.* For state and local education agencies, the Act is both a source of funds and a source of obligations.[5] *Armstrong v.*

---

5. The basic obligation thrust upon states as a condition to federal funding is to assure to all handicapped children the provision of a free appropriate public education. 20 U.S.C.

*Kline,* 476 F.Supp. 583, 602 (E.D.Pa.1979), *remanded on other grounds sub nom. Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269 (3rd Cir. 1980), *on remand,* 513 F.Supp. 425 (E.D.Pa.1980). For handicapped children within the contemplation of the EHCA, *see* 20 U.S.C. § 1401(1), the Act is a source of a federal statutory, "right to a free appropriate education" in every state electing to receive financial assistance under its auspices. *Id.* § 1412. *See, e. g., Kruelle v. New Castle County School District,* 642 F.2d 687 (3rd Cir. 1981); *Battle v. Commonwealth, supra; Armstrong v. Kline, supra; Rowley v. Board of Education,* 483 F.Supp. 536 (S.D.N.Y.1980); *Stuart v. Nappi,* 443 F.Supp. 1235 (D.Conn.1978). Finally, the Act guarantees parents or guardians of handicapped children the right to secure the provision of a free appropriate public education to their child, creating both administrative and judicial remedies to this end. 20 U.S.C. § 1415.[6]

Generally, courts have construed section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as also providing a private action for enforcement of the right of handicapped children to a free appropriate public education. *E. g., S–1 v. Turlington,* 635 F.2d 342 (5th Cir. 1981); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir. 1980); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga.1981); *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104 (N.D.Cal.1979); *Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex.1978), vacated and remanded on other grounds, 616 F.2d 205 (5th Cir. 1980); *Howard S. v. Friendswood Independent School District,* 454 F.Supp. 634 (S.D.Tex.1978). *See also* 34 C.R.F. § 104.33 (1979).

Section 504 provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

This statutory language is virtually identical to discriminatory prohibitions found in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq., *see Brown v. Sibley,* 650 F.2d 760, 767 (5th Cir. 1981), and at least one court has considered the section to be part of the general corpus of federal discrimination law. *New York State A.R.C. and Pari-*

§ 1412. State and local educational agencies are responsible for the proper identification, evaluation, and placement of handicapped children. Additionally, the states must establish educational priorities, first with respect to handicapped children who are not receiving any education, then with respect to the most severely handicapped children who are receiving inadequate education. *Id.* § 1412(3). Thus, school districts must provide an appropriate education to all handicapped children regardless of the severity of the handicap and the financial burden imposed. *See Kruelle v. New Castle County School District,* 642 F.2d 687 (3rd Cir. 1981).

The states must also establish procedural safeguards to assure to the maximum extent appropriate that handicapped children are "mainstreamed" into the regular education environment. 20 U.S.C. § 1412(5). Mainstreaming is clearly a predominant thesis underlying the EHCA. The courts, however, have been quick to recognize that the overriding requirement of a free appropriate public education may preclude mainstreaming in certain cases. *See, e.*

*g., North v. Board of Education,* 471 F.Supp. 136 (D.D.C.1979).

6. The EHCA provides extensive procedural rights to the parents or guardians of handicapped children. Parents are entitled to notice and opportunity to be heard concerning local school decisions affecting the provision of a free appropriate public education to their child. The Act provides the right to submit for decision before an impartial due process hearing officer any parental complaints with respect to a local agency decision concerning the provision of an appropriate education. If aggrieved by the hearing officer's decision of findings, or where an administrative appeal is authorized, by the decision of the reviewing officer, the parents have the right to bring a civil action in either state or federal district court. The Act provides for judicial review significantly different from that typically authorized in administrative cases; the court's decision is to be made from the preponderance of the evidence, consisting of the administrative record and such additional evidence as the parties request.

*si v. Carey,* 612 F.2d 644, 649 (2nd Cir. 1979).

■ To determine the requisites of the "free appropriate public education" to which handicapped children are entitled under the EHCA and section 504, the Court must first look to the EHCA and its legislative history for guidance. Generally, it is evident that an appropriate education is one which provides each handicapped child educational opportunities commensurate with that provided other children in the public schools. *Battle v. Commonwealth, supra,* at 279; *Rowley v. Board of Education, supra,* at 534. Specifically, a free appropriate public education is one which (1) meets reasonable state educational standards, and (2) provides specially designed instruction and related services[7] to meet the unique needs of handicapped children. 20 U.S.C. § 1401(16)–(19).

■ Several courts have recognized as a result of the Act's focus on the unique needs of handicapped children that the definition of a free appropriate public education must take into account the underlying educational goals established for handicapped children, since needs are necessarily determined in reference to goals. *See, e. g., Battle v. Commonwealth, supra,* at 276. The EHCA does not mandate specific educational goals for the handicapped, contemplating that in the first instance states shall have the responsibility to set individual educational goals and reasonable means to attain those goals. *Id.* The Act does contemplate, where possible, however, that educational objectives for the handicapped will be set with reference to objectives established for the non-handicapped, and there is clearly expressed in the legislative history of the Act the congressional view that attainment of self-sufficiency and, insofar as possible, freedom from dependency on caretakers, including the states, should be an underlying goal in the education of the handicapped. *See, e. g.,* S.Rep.No.168,

94th Cong., 1st Sess., *reprinted in* [1975] U.S. Code Cong. & Ad. News 1425, 1433. *See Battle v. Commonwealth, supra,* at 276–80; *Armstrong v. Kline, supra,* at 603–06. This underlying goal is much in evidence in the individual education plans (IEP) which have thus far determined the provision of special education and related services to Laura J. Emphasis has been placed on the development of language and interpersonal communication skills, self-care skills, and behavior modification, without which the child seems destined to spend the balance of her life in state supported institutions.

■ In this context, most courts confronted with the question whether the EHCA's guarantee of a "free appropriate public education" requires state and local educational agencies to provide residential placement when necessary to meet the goals of an individualized educational plan have answered in the affirmative. *E. g., Kruelle v. New Castle County School District, supra; North v. Board of Education,* 471 F.Supp. 136 (D.D.C.1979); *Matthews v. Campbell,* No. 78–0879–R (E.D.Va., July 16, 1979), *reported at* 3 Educ. Handic.L.Rep. 551:264; *Ladson v. Board of Education,* No. 78–2263 (D.D.C., March 12, 1979), *reported at* 3 Educ.Handic.L.Rep. 551:188; *Howard S. v. Friendswood ISD, supra* (section 504 case); *Matter of "A" Family,* 602 P.2d 157 (Mont.1979). Federal regulations explicitly contemplate residential placement if such a program is necessary to provide special education and related services to a handicapped child, and, in this instance, state law implementing the EHCA mandates expressly provides for residential placement. Tex. Educ. Code Ann. § 16.104 (Vernon Supp. 1980–1981). In short, little doubt remains that residential placement is part of "specially designed instruction . . . to meet the unique needs of a handicapped child" required by the EHCA. *Kruelle v. New Castle County School District, supra.*[8]

---

7. "Related services" includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services; provided, that

medical services are limited to diagnostic and evaluation purposes. 20 U.S.C. § 1401(17).

8. Residential placement is required when necessary for educational purposes. No obligation

## III.

There is no dispute that Laura J. is a severely multipli-handicapped child, or that Pearland ISD is a recipient of federal funds pursuant to the EHCA and responsible for the provision of a free appropriate public education to this child. At issue is whether the provision of specially designed instruction in a six-hour day program, augmented by home support, meets the standard of free appropriate education mandated by federal law, or whether residential placement is required. The parties also disagree as to what constitutes Laura's primary handicapping condition. Plaintiffs assert that Laura's primary handicapping condition is a type of organic psychosis first described by Dr. William Goldfarb and denominated "organic childhood schizophrenia," and that her severely depressed intellectual functioning and deficits in adaptive functioning are secondary to that disorder. Pearland, to the contrary, characterizes Laura's primary handicapping condition as severe mental retardation with emotional overlays, maladaptive behaviors, and seizures.

Both sides offered expert testimony at the administrative hearing below in support of their respective positions. Plaintiffs relied upon the testimony of Dr. Robert Currie and Alicia Parsley, a certified speech and language pathologist on staff at the Elks Foundation during Laura's stay there. Pearland relied principally on the testimony of Dr. Dorothy Wong, a psychologist retained by the school district on a consultant basis.

Dr. Currie's qualifications as an expert witness are impressive. He testified that Laura presents a textbook case of the organic psychosis described by Dr. William Goldfarb and denominated "childhood schizophrenia." In Currie's opinion, Laura's se-vere perceptual and cognitive disabilities, poor self-directing and self-regulating functions, poor self-identity and interpersonal skills, bizarre and inappropriate language reflective of a formal thought disorder, extreme anxiety and stress brought on by change, periods of restlessness, marked problems of withdrawal, depressed educational and intellectual functioning, and motor and seizure disorders are highly characteristic of the syndrome. In short, Currie testified that Laura J. is a multipli-handicapped child with severe language, learning and behavioral impairments symptomatic of childhood schizophrenia.

Alicia Parsley testified that Laura's language disorder is consistent with a diagnosis of childhood schizophrenia. She characterized Laura's language as bizarre and contextually inappropriate, noting delayed echolalia, use of idiosyncratic speech, flatness of speech, difficulty with pronouns, and the projection of self onto objects, all characteristic of a thought disorder consistent with schizophrenia. Both Dr. Currie and Ms. Parsley viewed Laura's language as indicative of withdrawal into a fantasy world and splitting from reality. Both professionals also observed that Laura's syntax and vocabulary were not characteristic of severely mentally retarded children functioning at her intellectual level.

Dr. Wong, Pearland's expert, testified below, and other educators at Pearland testified both below and at trial that Laura indeed manifests many of the behaviors observed by plaintiffs' experts and made the basis of Dr. Currie's diagnosis. Dr. Wong, however, disagreed with that diagnosis. On the basis of her examination of Laura, conducted in two and one-half hours in October 1980, plus observation of Laura in classroom on two previous occasions, Dr. Wong diagnosed Laura as being severely mentally re-

to provide residential placement arises where the placement is a response to medical, social, or emotional problems that are *segregable* from the learning process. *Kruelle v. New Castle County School District, supra.* The concept of education under the EHCA is necessarily broad, however, and the courts have held that residential placement is within the contem-plation of the Act where the child's social, emotional, medical, and educational problems are so intertwined that it is impossible for a court to separate them. *Kruelle, supra; North v. Board of Education, supra,* at 139–40. The Court finds such to be the case here. *See also Tatro v. State of Texas, supra.*

tarded with emotional overlays, maladaptive behaviors and a seizure disorder. Her disagreement with plaintiffs' experts stemmed primarily from what she viewed as the absence of blatant psychotic behaviors, namely, hallucinations and aggressive or destructive acting-out behaviors, and Laura's ability to respond to verbal prompting.

The Court is persuaded from the evidence that Laura J.'s behavior is that of a severely schizophrenic child. To some degree, Laura exhibits behaviors that would be appropriate for both an organic schizophrenic child and a severely mentally retarded child. Yet Dr. Wong could not rule out the possibility that Laura's bizarre and inappropriate language was indicative of hallucinatory thought process, and while Dr. Wong observed no aggressive or destructive behaviors in the brief time in which she observed Laura, there is undisputed evidence that Laura J. has been increasingly aggressive and acting-out at home since entering the Pearland district. Dr. Currie also observed such behavior at or about the time Laura was admitted to the Elks Foundation for evaluation.

More significant, however, is the clear evidence of Laura's continuing intellectual regression since 1975. While she at one time functioned at the level of a mildly mentally retarded child, her present functioning is severe, bordering on profound. This regression cannot be satisfactorily explained by the increase in her chronological age. Nor is a diagnosis of severe mental retardation consistent with the language skills Laura does possess, although her language tends to be disassociated from reality. Clearly, Laura is able to form relationships with others, to communicate orally, and with constant prompting and supervision, to attend to her surroundings. These are not, however, beyond the potential of schizophrenic children, and the nature of

Laura's communications and relationships, if anything, reinforces Dr. Currie's diagnosis. *See Armstrong v. Kline, supra,* at 589–90.

■ The determination of Laura's primary handicapping condition, while significant to the placement question, is not dispositive of it. Obviously, failure to identify properly a child's handicap could result in the provision of an inappropriate education. Ultimately, however, the question is reduced to whether the child's educational placement is suited to her unique needs, and the answer determined by whether the child is making meaningful progress toward achievement of her educational goals. Even were the Court in this case to accept Pearland's assessment of Laura's handicapping condition, it could not on that basis find that her placement in a six-hour day program is appropriate to her unique special educational needs, in view of the overwhelming evidence in the record that Laura has made no significant education progress in that placement and is unlikely to make progress in any educational placement that cannot provide her a constant structured environment, a 24-hour behavior modification program, and an intensive language program.[9]

Laura is now fifteen years old. She functions, however, at a pre-kindergarten level. She can toilet herself, but she is inconsistent in this area and incapable of dealing with her menses. She cannot wash or dress herself unaided, and her eating skills remain impoverished. She has regressed severely in her intellectual functioning since 1975, and even Dr. Wong, Pearland's expert, conceded at the administrative hearing that she has made no meaningful progress since entering the Pearland School District in early 1979.

At trial, Mrs. J. testified that Laura's behavior at home has continued to deterio-

**9.** This is an area in which the Court must necessarily look to expert opinion for guidance. Having rejected Pearland's contention that Laura J. is being provided an appropriate education in her current six-hour day placement, the Court's findings on this point are based on the testimony of Dr. Currie and Ms. Parsley. With respect to basic objectives in Laura's educational programming, Dr. Wong's recommendations are consistent with those of plaintiffs' experts.

rate. Her withdrawal is more severe and her maladaptive behavior more pronounced; she requires constant supervision of a nature and quality which Mrs. J., despite her best efforts, is no longer able to provide. Both Dr. Currie and Ms. Parsley, who saw Laura in her home shortly before the trial, confirmed that Laura's condition had grown worse. Further, they observed appreciable slurring in Laura's enunciation, which heretofore has not been a problem.

The presenting picture of Laura J. in the classroom environment is vastly different. As before, Laura continues to exhibit no unusually aggressive or self-destructive behaviors. She seems calm, is capable of responding to verbal commands (although her response may be contextually inappropriate at times), and while she does not interact with other children in the class, she will often observe their activities, as she has done in the past. She does exhibit psychotic behaviors, but the educators involved with Laura's program at Pearland who testified before the Court all perceived that Laura was making some progress in her current placement.

The preponderance of the evidence, however, is to the contrary. By all objective indications Laura J. has made no meaningful progress in her current placement at Pearland; she may well have regressed in certain areas. She is no closer now to the goal of avoiding institutionalization than she was in 1978, and with each passing day her prognosis becomes more dismal. That Laura J.'s behavioral problems at school do not approach those at home is not surprising. As Dr. Currie indicated, although expert opinion is hardly necessary, a classroom is a structured setting in which children are constrained into certain behaviors. The experts and educators involved in this case all agree that Laura can progress in a warm, structured environment; indeed, it is clear that such an environment is essential if Laura's emotional and behavioral disorders are to be dealt with so that learning can take place.

Unfortunately, the structured setting necessary for appropriate behavior modification and weaning Laura from withdrawal into a fantasy world is at the same time extremely stressful to schizophrenic children. When freed from the confines of the setting, many children like Laura J. are unable to rid themselves of stress in socially acceptable ways—hence, the calm, passive, even attentive Laura at school, and the aggressive, acting-out or severely withdrawn Laura at home.

More significantly, the conflicting reports concerning Laura serve to underscore the fact that whatever gains have been made within the confines of a six-hour day program have not been followed through at home. There is no evidence in the record that Pearland has in place a home support program capable of providing the special education and related services needs of this child, and even if such were extant, the Court would have serious reservations whether any six-hour day program augmented by a home support system adequately could provide the constant structured environment, the round-the-clock behavior modification and the intensive language program the Court finds must be part of any individual education plan tailored to meet Laura's unique needs.[10]

Therefore, it is the decision of this Court that Laura J. be placed, at no cost to her parents, in an educational residential facility capable of meeting the unique needs of

10. In her report, Dr. Wong opined that Laura's separation from her parents occasioned by residential placement might exacerbate a fear of abandonment, and that if placed in an inpatient facility for emotionally disturbed children, Laura might emulate the self-destructive behavior of others. Both of these objections are highly speculative. Indeed, with respect to the first factor, evidence concerning Laura's stay at the Elks Foundation suggests that Dr. Wong's fear is unfounded. The second factor, even if possible, does not argue against residential placement. It serves only to underscore the need for Pearland to secure an *appropriate* residential placement for Laura J. Even were the Court to view such possibilities as clear and present dangers, this Court would be left with no choice but to order residential placement in view of the available alternatives. *See Matthews v. Campbell, supra*, 3 Educ.Handic.L. Rep. 551:265–66.

severely intellectually impaired schizophrenic children. The facility selected must be a year-round, 24-hour school capable of providing Laura a constant structured environment, including a 24-hour behavior management program, and an intensive language program. At a minimum, Laura requires the services of the following professionals: a licensed psychologist or psychiatrist consultant, a qualified speech and language pathologist, a special education teacher trained and experienced in working with organic childhood schizophrenics, and a licensed occupational therapist. Consistent with the underlying purposes of the EHCA, the residential placement selected should be one that, while providing for Laura's unique educational needs, does so in the least restrictive manner.

The Court feels that development of a detailed IEP for Laura, in the first instance, is best left with Pearland and the professional staff of the residential facility selected. The Court anticipates that the IEP formulated, consistent with the unique needs of Laura, will concentrate on decreasing her anxiety and withdrawal tendencies, modifying maladaptive behaviors, and imparting basis language, self-care and prevocational skills which Laura must acquire if she is to have any hope of avoiding institutionalization.

## IV.

The prognosis for Laura J. is extremely guarded. Surely, she is far more disturbed now than she was at age six, and her present chances of ever acquiring the degree of self-sufficiency necessary to avoid total and complete institutionalization are marginal. There is no occasion for the Court to question the valiant and unceasing efforts of Laura's parents to secure help for her, nor Pearland's utilization of available resources to the fullest possible extent in seeking to provide such help. This Court's concern is for the uncertain future of a child, a future that holds forth little promise of hope unless the promise of a free appropriate public education is presently realized.

Yet there is hope, abundant hope, that with an appropriate education, with specially designed instruction to meet the unique needs of this severely multipli-handicapped girl, Laura J. can avoid this dismal prognosis. That hope—indeed, that expectation— is the very foundation upon which Congress created the Education for All Handicapped Children Act. The language and legislative history of that Act simply do not admit of the possibility that some children may be beyond the reach of our educational expertise. That is the premise upon which this Court's decision is based.

Admittedly, the unequivocal congressional directive to provide an appropriate education for all children regardless of the severity of the handicap places a substantial burden on state and local educational agencies in certain instances. Perhaps this is one such instance. Regardless of the financial and administrative burdens that may obtain, however, the Act imposes upon schools the singular obligation to provide a comprehensive range of services to accommodate a handicapped child's educational needs, and if necessary, to resort to residential placement. It is difficult to conceive of a more appropriate case for which the unique needs of a child, and perhaps the needs of our society, require this final resort.