Leslie B. v. Winnacunnet Coop Sch Dis CV-94-530-SD 04/09/98
UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Leslie B., by her parents,
 John C. and Nancy M.I.


        v.                          Civil No. 94-530-SD

Winnacunnet Cooperative
 School District


                        O R D E R


     In this civil action, plaintiff Leslie B., by and through
her parents John C. and Nancy M.I., has filed an appeal pursuant
to 20 U.S.C. § 1415(e)(2) of the Individuals with Disabilities
Education Act (IDEA), challenging a hearing officer's approval of
an individualized education program (IEP) for the 1994-95 school
year proposed by defendant Winnacunnet Cooperative School
District.

     Presently before the court is defendant's motion for summary
judgment.


                        Background

     Leslie was born on December 27, 1978, and lived with her
mother and stepfather in the town of Hampton Falls, which is
within the Winnacunnet Cooperative School District.  Tr. No. 94-
20, at 1-62,63.

In September 1991, when she was just starting the seventh grade[1] at the Lincoln Akerman School in Hampton Falls, Leslie was coded as both Emotionally Handicapped (EH) and Other Health Impaired (OHI) due to Attention Deficit Disorder without hyperactivity (ADD).  Tr. No. 94-20, at 2-55, 58.

Leslie continued to attend Lincoln Akerman until her eighth-grade year, which began in September of 1992.  At about this time, Leslie's mother, Nancy I., requested an out-of-district placement for Leslie because Leslie did not have the social and emotional skills necessary to cope with what Leslie perceived to be ongoing verbal and physical harassment from other students.  Tr. No. 94-20, at 2-61.  The ongoing abuse suffered by Leslie included pushing, shoving, hair-pulling, physical fighting, and name-calling.  Tr. No. 94-20, at 1-190, 2-64, 3-156.  In addition, Mrs. I. believed that the personnel at Lincoln Akerman did not adequately implement Leslie's IEP.  Tr. No. 94-20, at 1-186,  2-63.  Mrs. I. believed that, as a result, Leslie had poor self-esteem and no friends.  Tr. No. 94-20, at 1-190.

In December of 1992, Leslie was placed at the Seabrook Elementary and Middle School, where she stayed until she completed the eighth grade that June.  Tr. No. 94-20, at 1-186, 2-66.  Leslie made friendships at Seabrook, and her emotional

---

[1]Although some transcript testimony indicates that Leslie was in sixth grade at the time, the court has assumed that she was in seventh grade because it is undisputed that she was in eighth grade the following year.

problems appeared to dissipate. Tr. No. 94-20, at 2-67. In addition, she received high grades. Tr. No. 94-20, at 1-188. Her mother attributes the change to the fact that the school immediately intervened and, when necessary, disciplined students when there were interpersonal problems between students. Tr. No. 94-20, at 2-66, 77. In addition, she believed that "[a]ll the IEP issues were immediately addressed and addressed appropriately" at Seabrook, Tr. No. 94-20, 2-67, and the school called bi-weekly follow-up meetings concerning its implementation of the IEP. Tr. No. 94-20, at 1-187. Moreover, according to Mrs. I., counseling services were freely made available to Leslie. Tr. No. 94-20, at 1-187.

In ninth grade, her first year of high school, Leslie attended a special education program at Winnacunnet High School pursuant to an IEP and Annual Statement of Program (ASP). Leslie's 1993-1994 program was primarily a mainstream program, with modifications in her academic classes. Tr. 94-37, at 2-33. In addition to her traditional academic classes, Leslie participated in individual and group counseling, a special education class entitled "Decisions," and outdoor education.

Leslie's grades for the first quarter of ninth grade qualified her for the honor roll. As the year progressed, her academic performance, including her attendance, declined significantly. Id. at 2-172. In her fourth quarter, she was

3

regularly absent (missing more than 41 half-days), in part because she was attending her first due process hearing and in part because of other events, including a car accident in which she sustained injuries. Id. at 2-46, 5-140.

According to the school district, Eileen Savage, the Director of Special Services for the school district, wrote to Leslie's mother a couple of times about Leslie's lack of attendance, telling her that if Leslie did not attend school regularly, school policy required the filing of a CHINS (Child in Need of Services) petition based on truancy.

On August 30, 1994, Leslie was due for a three-year reevaluation. However, the school district agreed to and did begin testing of Leslie in the spring of 1994. The testing included a psychological evaluation by Dr. Robert Webster, a consulting psychologist for the school district, who recommended that the district continue Leslie's EH Code.

On June 17, 1994, the evaluation team reviewed Leslie's evaluations and recommended that Leslie's EH code continue but that her OHI code be dropped because of a lack of medical documentation for ADD.

The team proposed a 1994-1995 IEP which provided that Leslie would be mainstreamed for three core academic courses and two electives per semester. In addition to continued placement in a regular classroom, the school district proposed that Leslie

4

receive resource room help on the placement continuum of Table 1100.2 of N.H. Adm. R. Ed. 1115.04.  The program again included Leslie's involvement in the Decisions class and outdoor education.

Leslie's parents, dissatisfied that the 1994 IEP was appropriate, removed her from Winnacunnet and placed her in a private school, where she completed her high school education.

The Due Process Hearings

The parties participated in two due process hearings before the same hearing officer.  The first hearing, held in May of 1994, see State Department of Education Case No. 94-20, concerned (1) whether Leslie's 1993-1994 IEP for ninth grade was being implemented, and (2) whether Leslie should be given an out-of-district placement because of the unsafe environment at Winnacunnet High School.  Prehearing Transcript No. 94-20, at 2, 7, 17, 48.  The hearing officer terminated the hearing after Mrs. I. had presented her case because Mr. I. refused to control his behavior, which included threatening to harm the school district's attorney and its witness Stephen Piro, who had been Leslie's counselor.  Tr. No. 94-20, at 5-177 to 185.  According to the school district, Mr. I. was later convicted of criminal threatening arising from the events at that hearing.

5

On July 12, 1994, the parents requested that a second due process hearing be held so they could contest the proposed 1994-1995 IEP. The hearing initially concerned the evaluation team's decision to code Leslie under the single code of Emotionally Handicapped, rather than under the two codes of EH and OHI. The scope of the hearing was later expanded to include the issues of whether her parents were denied the opportunity to participate in the development of the 1994-95 IEP and placement, whether the 1994-95 IEP was appropriate, and whether Winnacunnet was an appropriate placement.

The due process hearing lasted for six days, and testimony was heard from three witnesses--Eileen Savage, Director of Special Education at Winnacunnet High School; Nancy I.; and Carol Cook, Director of the Learning Skills Academy. The hearing officer closed the hearing to further testimony on the sixth day, citing the "unduly argumentative" behavior of "the Parent." See Hearing Officer's Decision at 1. At that point, the hearing officer had heard over 2000 pages of testimony (including both the 94-20 and 94-37 due process hearings).

On September 19, 1994, the hearing officer issued a decision adverse to the plaintiffs. See State Department of Education Case No. 94-37. In support of his findings that the school district had offered an appropriate IEP, and that Leslie was properly placed at Winnacunnet, the hearing officer wrote:

6

> The Hearing Officer finds, by clear and convincing evidence, that the District in this case, on these facts, has offered an appropriate IEP, reasonably calculated to allow Student to achieve passing marks and be promoted, if Student will attend school. To achieve this, Parent must cooperate and District repeatedly attempted to gain that cooperation, by clear and convincing evidence.

Hearing Officer's Decision at 5 (attached to Plaintiffs' Amendments to Pleadings, document 5).

The plaintiffs now appeal the hearing officer's ruling in this federal court.

From the court's review of the pleadings, the plaintiffs' appeal focuses on four arguments: (1) the 1994-1995 IEP was not properly applied by Winnacunnet High School because it provided an "unsafe" environment for Leslie (both actually and from Leslie's point of view); (2) Leslie's IEP was flawed because she should have been coded as both EH and OHI rather than solely EH; (3) the hearing officer's ruling was procedurally flawed because he disregarded evidence favorable to Leslie; and (4) the hearing officer was biased against the plaintiffs, and pro-se parties in general, and should have recused himself. Defendant's summary judgment motion attacks each theory.

7

<u>Discussion</u>

<u>The Appropriateness of Leslie's IEP</u>

The IDEA obliges states to provide all handicapped children a "free appropriate education." 20 U.S.C. § 1412(2)(B). Recognizing the diverse range of special needs presented by handicapped children, the IDEA contains few substantive standards of "appropriate education," but rather sets out procedures for school officials and parents to create an individualized education program (IEP) that is "custom tailored to address the handicapped child's 'unique needs.'" <u>Lenn v. Portland School Comm.</u>, 998 F.2d 1083, 1086 (1st Cir. 1993); <u>see also</u> <u>Amann v. Stow School Sys.</u>, 982 F.2d 644, 646 (1st Cir. 1992) (citing <u>Roland M. v. Concord School Comm.</u>, 910 F.2d 983, 987 (1st Cir. 1990)). The IEP is a comprehensive statement of the unique educational needs of the child and the specially designed instruction and related services to be employed to meet those needs. As long as an IEP is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade," <u>Hendrick Hudson Dist. Bd. of Ed. v. Rowley</u>, 458 U.S. 176, 204 (1982), the state has met its obligation to provide that child a "free appropriate education."

The IDEA emphasizes parent participation in developing a child's IEP and assessing its effectiveness in providing an "appropriate education" for the child. <u>School Comm. of</u>

8

<u>Burlington v. Department of Ed. of Mass.</u>, 471 U.S. 359, 368 (1985). When cooperation between school officials and parents degenerates, resulting in a lack of consensus, the parents are entitled to an impartial due process hearing to resolve their complaints. The Act also provides for judicial review in state or federal court to any party aggrieved by the findings and decision made after the due process hearing.[2] When review of a contested IEP takes years to run its course, parents who disapprove of an IEP often remove the child to a private school for the interim. The Supreme Court has held that the reviewing court's equitable authority under the IDEA to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(e)(2), is broad enough "to order school authorities to reimburse parents for their expenditures on private special education for a child

---

[2]This Circuit has described the standard of review as follows:

> Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason. In the end, the judicial function at the trial-court level is one of involved oversight, and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

<u>Lenn</u>, <u>supra</u>, 998 F.2d at 1087 (citations and quotation omitted).

9

if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Burlington, supra, 471 U.S. at 369.

Leslie's parents first contend that school officials misidentified Leslie's handicap in her 1994 IEP by coding her as only Emotionally Handicapped (EH), instead of Other Health Impaired (OHI). One court has noted that "[o]bviously, failure to identify properly a child's handicap could result in the provision of an inappropriate education." Gladys J. v. Pearland Indep. School Dist., 520 F. Supp. 869, 877 (S.D. Texas 1981). Under state regulations, a child's handicap is designated on the IEP by a coding system, and the OHI code designates, among other things, ADD. Leslie was first diagnosed with ADD in 1991 by a psychologist at the North Shore Children's Hospital Neurodevelopmental Center. Accordingly, the Hampton Falls School District, where Leslie was attending school at the time, coded Leslie with OHI. When the Winnacunnet School District reevaluated Leslie in 1994, school officials dropped the OHI code from her IEP.

Winnacunnet argues that there was no proper medical documentation of the ADD diagnosis to support the OHI coding for Leslie's 1994 IEP. Winnacunnet claims that the school officials who developed Leslie's 1994 IEP were obligated to disregard the 1991 North Shore diagnosis of ADD as outdated. The IDEA requires

10

school officials every three years to reevaluate *de novo* a handicapped child's educational needs, relying on data no more than three years old. The court finds this a curious argument, however, since the August 1991 North Shore diagnosis of ADD was obviously less than three years old when school officials began reevaluating Leslie in the spring of 1994. Next, Winnacunnet argues that there was no medical documentation of the ADD diagnosis from a physician, which is required by the state regulations before a child may be coded OHI. N.H. Adm. R. Ed. 1107.05, Table 1100.1. Winnacunnet rests its argument on the technicality that the 1991 North Shore diagnosis of ADD was rendered by a psychologist, not a physician. However, during Leslie's 1994 reevaluation at Winnacunnet, Leslie's treating physician, Dr. Maria C. Gaticales, wrote several letters to school officials relating that she diagnosed Leslie with ADD. The school officials disregarded Dr. Gaticales's first letter, because they believed it was ambiguous about whether Dr. Gaticales rendered her own independent diagnosis of ADD or simply relied on the 1991 North Shore diagnosis. However, as soon as Dr. Gaticales became aware of the misunderstanding, she wrote a follow-up letter spelling out unambiguously that she was not merely relying on the 1991 North Shore diagnosis. Letter of Aug. 16, 1994, attached to Deposition of Dr. Gaticales as Deposition Exhibit 30. Despite the lack of ambiguity, school officials

11

continued to disregard Dr. Gaticales's diagnosis, believing, as Eileen Savage testified at the due process hearing, that the "emphasis [of the diagnosis] is really on the emotional disturbance, the significant depression and anxiety, which we completely support." Transcript of August 1994 Due Process Hearing at 1-88. However, Dr. Gaticales's third letter made clear that ADD was primary to Leslie's other educational problems.

> [M]y medical evaluation and examination of Leslie have resulted in my . . . confirmation of the previous diagnosis of Attention Deficit Disorder as the primary diagnosis, and her emotional problems as secondary.
> The emotional problems are a result of her frustration and anxiety stemming from her inability to function in school and deal properly with her peer group. Leslie's frustrations and poor self-esteem are a result of her Attention Deficit Disorder.

Deposition Exhibit at 32. Furthermore, Dr. Gaticales's diagnosis of ADD was corroborated by Richard Guare, Ph.D., and Margaret Dawson, Ed.D., at the Center for Learning and Attention Disorders. Drs. Guare and Dawson likewise diagnosed Leslie with ADD, but school officials disregarded their diagnosis on the technical ground that neither Dr. Guare nor Dr. Dawson is a physician, even though both are doctors who specialize in the field of attention deficit disorders. The court finds that Dr. Gaticales's diagnosis, which was confirmed by the report of Drs. Guare and Dawson, was proper medical documentation that Leslie

12

suffered from ADD and that school officials improperly dropped the OHI coding.

Even assuming that Dr. Gaticales had never diagnosed Leslie with ADD, there is a more fundamental flaw in Winnacunnet's argument that it was appropriate to drop the OHI for lack of a physician's diagnosis of ADD. Granted, the state regulations require an OHI coding to be supported by a physician's diagnosis. However, this does not mean, as Winnacunnet assumes, that the school district may obstinately refuse to code a child with OHI unless the child's parents come forward with a physician's diagnosis. Rather, the regulations place the burden on the school, providing that "[t]he student shall be evaluated by a qualified examiner in each area of suspected disability." N.H. Adm. R. Ed. 1107.05(d). Thus the state regulations define, not the parent's duty, but rather the school district's duty to have a physician evaluate any child suspected of having ADD. In dereliction of this duty, Winnacunnet had Leslie evaluated by Dr. Webster, who specifically noted that "[t]he verification of an attention deficit disorder is beyond the scope of this evaluation." Defendant's Exhibits, Vol. II, at 418. Nonetheless, Dr. Webster continued, "The reader is referred to the excellent neuropsychological evaluation report from the North Shore Children's Hospital Neurodevelopmental Center which provided evidence of an attention deficient disorder." Id.

13

Still, Winnacunnet made no effort to determine whether Leslie had ADD, but rather assumed that she did not because her parents did not produce a physician's diagnosis. It was Winnacunnet's duty to have Leslie evaluated for ADD by a physician, and Winnacunnet cannot now rely on its own failure of duty as a justification for dropping the OHI coding for lack of a physician's diagnosis of ADD. In sum, Winnacunnet improperly dropped the OHI coding, rendering Leslie's IEP inappropriate.

Furthermore, three other factors coalesced to prevent Leslie from receiving an "appropriate education" at Winnacunnet. First, the cooperation between Leslie's parents and school officials completely broke down. In Board of Educ., Cook County v. Illinois State Bd. of Educ., 938 F.2d 712, 717 (7th Cir. 1991), the Seventh Circuit upheld a finding that placement in a particular school was not "reasonably calculated" to supply educational benefits to the handicapped student because "the parents' attitudes were severe enough to doom any attempt to educate [the student] at [the school in question]." Id. at 716. To justify considering the effect of parental hostility, the court reasoned that "[t]he sole legal requirement is that the IEP be designed to serve the educational interests of the child. The [IDEA] does not limit the factors that can be considered in judging the likely impact of the IEP on the child so long as they bear on the question of expected educational benefits." Id.

14

Here, the breakdown in cooperation between Leslie's parents and school officials was severe enough to doom any attempt to educate Leslie at Winnacunnet.[3] Dr. Robert G. Webster, the evaluating physician hired by Winnacunnet, noted:

> An additional factor should also be discussed in regard to Leslie's education program, one which is perhaps of foremost importance. The degree of polarization which presently exists between Leslie's family and the school is extreme. At the present time there seems to have been a complete or nearly complete breakdown in terms of a cooperative relationship between the school and Leslie's mother and step-father. Unfortunately, Leslie is very much in the middle of this difficulty. . . .
> The true misfortune of a situation such as now appears to exist for Leslie is that when a breakdown in communication and cooperation occurs, the best interests of the student are jeopardized, if not sacrificed.

School District Exhibits, Vol. II, at 418-19.

Second, the relationship between Leslie and the school officials deteriorated, dooming any attempt to educate Leslie at

---

[3]The court finds that the hearing officer's findings on the issue of parental hostility are not entitled to deference. It is entirely unclear to this court why the hearing officer rejected the argument that Leslie's parents' hostility to Winnacunnet doomed any attempt to educate her at that school. The only apparent argumentation on this issue from the hearing officer's decision is that "[f]or Parent to prevail in the demand to place Student out of district, Parent must have some credible evidence of Student's danger from an 'educational' perspective." Hearing Officer's Decision at 5 (attached to Plaintiffs' Amendments to Pleadings (document 5)). However, if Leslie's parents' hostility to Winnacunnet doomed any attempt to educate her there, she was in danger from an "educational" perspective. Thus the court does not understand why the hearing officer rejected the parental hostility argument.

15

Winnacunnet. Dr. Webster also stated, "Not surprisingly, Leslie is siding with her family, perceiving the school staff and administration as failing to meet her educational needs." Id. at 419.

> Leslie made it clear that she would very much like to change schools. She does not trust much of the staff, relating that she has been called a liar. As a result of her difficulties with staff and other students, she describes herself as having no self-esteem. . . . Her interactions with the counselors in the special education department at Winnacunnet are not described as positive. She relates that she does not feel comfortable with Mr. Piro and that she feels restricted by Ms. Trescosta, her present counselor.

Id. at 407.

Third, a hostile peer group prevented Leslie from receiving an appropriate education at Winnacunnet. At the due process hearing, a fellow Winnacunnet classmate of Leslie's testified that he witnessed numerous verbal and a few physical assaults against Leslie by other Winnacunnet students. Transcript of Due Process Hearing 94-20, at 2-12. It is clear that Leslie was not going to receive an appropriate education at a school where she was repeatedly assaulted, both verbally and physically, by a hostile peer group. "[Leslie's] peer relations are an area of difficulty and often become a distraction to her academics." IEP Evaluation Summary, supra, at 423.

Winnacunnet argues that Leslie's trouble with her peer group was "typical high school kids' stuff, nothing out of the ordinary

16

or serious." Defendant's Memorandum in Support of Motion for Summary Judgment at 17; see also Transcript of Due Process Hearing 94-37 at 1-207. The school officials' attitude in this regard highlights the inappropriateness of Winnacunnet for Leslie. The school officials' acceptance of repeated verbal and physical assaults of students in their care as the norm, or as "typical high school kids' stuff," is troubling. In addition, actions that are merely "typical high school kids' stuff" to well-adjusted students may be devastating for severely emotionally troubled children such as Leslie. Dr. Gaticales noted:

> The only major stressor in Leslie's life at this time . . . is her school environment. In my opinion, it is absolutely necessary for Leslie to be enrolled in a special school which deals not only with the severe emotional problems of a youngster, but also provides the proper school environment for such a handicapped child. All the therapists, counselors and well meaning teachers cannot make up for a hostile peer environment at this very crucial time in Leslie's life. If she remains at Winnacunnet High School . . . my prognosis for a total recovery is unfavorable. The environment at Winnacunnet High School is no longer conducive [to] Leslie's recovery."

Defendant's Exhibits, Vol. II, at 364.

The Winnacunnet school officials' trivialization of Leslie's complaints as "typical high school kids' stuff" highlights Winnacunnet's inability to accommodate Leslie's special needs as a handicapped child.

17

In sum, it was clear that Leslie would not get an appropriate education at Winnacunnet because cooperation between her parents and school officials had broken down, the relations between school officials and Leslie were unproductive, and Leslie was being assaulted by her peers.

Winnacunnet's principal argument is that this court should not consider the effects of parental and peer group hostility[4] because Winnacunnet is not at fault if those forces coalesced to prevent Leslie from receiving an appropriate education at Winnacunnet. The implicit premise of Winnacunnet's argument is that the IDEA's duty to provide a "free appropriate education" is a standard based on fault. One court has rejected that interpretation of the statute in favor of a strict liability

---

[4]The court finds that the hearing officer's findings on the issue of peer hostility to Leslie are not entitled to deference. The hearing officer found that "[w]hat is lacking is an independent basis proving why Student feels 'unsafe' and what role Student's behavior plays in the various situations that create the unsafe environment." Hearing Officer's Decision at 4 (attached to Plaintiffs' Amendments to Pleadings (document 5)). First, the testimony of Leslie's fellow student that he witnessed several verbal and physical assaults against Leslie, Transcript of Due Process Hearing 94-20, at 2-14, is clearly the independent basis proving why Leslie felt unsafe at Winnacunnet. The hearing officer did not argue that the witness lacked credibility. Rather, the hearing officer simply ignored the testimony, focusing instead on a witness from a previous hearing who, according to the hearing officer, believed that "most of the verbal abuse was just typical teenage talk." Second, since peer conflict was directly related to Leslie's handicap, it is irrelevant "what role [Leslie's] behavior plays in the various situations that create the unsafe environment." Hearing Officer's Decision at 4.

18

standard. <u>Greenbush School Comm. v. Mr. & Mrs. K.</u>, 949 F. Supp. 934, 941 (D. Me. 1996). That court said,

> [C]ourts are not called upon to assign blame to the respective parties in order to determine who is more at fault for the conflict [between parents and school officials]. Our responsibilities under the Act are, fortunately, much less complicated. Focusing on the child, we must determine whether his or her IEP and school placement offer educational benefit. If not, the plan does not satisfy the requirements of IDEA . . . .

<u>Id.</u>

This court generally agrees with the <u>Greenbush</u> strict liability standard, but adds the following qualifications. When the relief sought is a prospective order of private school placement, the issue of fault between the parents and the school is entirely irrelevant because, under the IDEA, the interests of the child are paramount. However, when the relief sought is a retrospective monetary award to reimburse the parents for costs incurred on private school tuition, the issue of fault between parents and the school becomes relevant. Generally, reimbursement is an appropriate remedy only because otherwise,

> parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be appropriate placement. . . . [If the parents could not be reimbursed], the child's right to a *free* appropriate education . . . would be less than complete.

19

<u>Burlington</u>, <u>supra</u>, 471 U.S. at 370. However, parents who render an IEP inappropriate by their own hostility to the designated school have an additional choice--they can be more cooperative with school officials in achieving the common goal of educating the child. Denying total reimbursement for parents who instead choose to remain hostile does not undermine the child's right to a free appropriate education. <u>B.G. by F.G. v. Cranford Board of Educ.</u>, 702 F. Supp. 1158, 1166 (D.N.J. 1988) ("The cooperative efforts of parents and school authorities are inextricably intertwined with a handicapped child's inalienable right to a "free appropriate education." Whoever disrupts that cooperative venture--whether it be parents or school authorities--does so at his or her financial peril.").

In addition, only the most determinist view of human nature would disagree that issues of fault between the child and the school are relevant. For instance, if the handicapped child sabotages the designated school's efforts by voluntarily choosing to cultivate hostile relationships with the peer group and teachers at the school, then the school district is clearly not liable to pay for the child's placement in a private school.

Here, the school district argues that it was Leslie's fault that she was not getting an "appropriate education." First, the school district argues that the real reason Leslie was failing at Winnacunnet was that she was missing school. However, the school

20

district's argument puts the cart before the horse.  It is clear from the record that the reasons Leslie was missing school (aside from the automobile accident) were the peer conflicts, her parents' hostility to the school, and the negative relations between her and school officials.  Those reasons, and not the bare fact of missing school, were the driving force behind Winnacunnet's failure to provide Leslie an appropriate education.

Second, the school district argues that Leslie's conflicts with her peer group at Winnacunnet were her fault, and thus not the school district's responsibility.  The school district points out that "[n]ot only does Leslie have problems with her peers in school, she has peer problems in other settings: a church group and a beauty pageant."  School District's Memorandum at 19.  The court recognizes that there are some handicapped children who simply choose to cultivate hostile relationships with their peer groups.  However, some children have social problems that are directly related to their handicap and are not their fault.  See Christopher T. v. San Francisco Unif. School Dist., 553 F. Supp. 1107, 1120 (N.D. Calif. 1982) ("emotional and social needs [may be] in a particular child's case unseverable from that child's educational needs"); B.G. by F.G., supra, 702 F. Supp. at 1157 ("This Court finds that B.G.'s emotional problems and lack of socialization skills . . . are unseverable from the learning process.").  Leslie's social problems with her Winnacunnet peers

21

were a product of her handicap rather than her voluntary choice.
The 1991 North Shore evaluation noted that

> Leslie is . . . at considerable risk for continued academic, social and emotional difficulties. She presently does not have the resources or the coping skills to adaptively handle the intense feelings which she is experiencing in relation to her academic and interpersonal performance and requires supportive and mindful interventions across all settings (ie., home, school, and social settings).

Gaticales Deposition Exhibit 37, at 9. Dr. Webster's 1994 evaluation confirmed Leslie's "long-term, on-going difficulties with peers," School District's Exhibit, Vol. 3, at 415, as well as her lack of ordinary social skills necessary to establish healthy relations with her peers. This medical evidence undercuts any claim that Leslie's social problems are her fault as a product of her choice, as opposed to a product of her disability. Furthermore, Leslie's social problems are related to her disability in a different way because she was singled out for hostile treatment by her peers on the basis of her disability. Dr. Gaticales notes that "she again was attacked by her peer group, who sensed her extreme vulnerability and special treatment by her teachers." Gaticales Deposition Exhibit at 34.

Since Leslie's social problems are directly related to her disability, the school district's denial of responsibility on the ground that "Leslie's problems are not being caused by

22

Winnacunnet" is absurd. Defendant's Memorandum at 23. Such a denial could be likened to an argument that a school is not responsible to provide wheelchair access because the wheelchair-bound student's walking disability was not caused by the school. Under the <u>Greenbush</u> strict liability standard, just as the school is strictly liable to either provide access to the wheelchair-bound student or pay for a private school that can provide such access, so too Winnacunnet was strictly liable to either diffuse Leslie's peer conflicts enough for her to receive an appropriate education or pay for her to attend a school that could adequately accommodate her disability as it pertained to peer relations. It was clear that the hostile peer group at Winnacunnet was preventing Leslie from receiving an appropriate education there, and thus Winnacunnet could not adequately accommodate Leslie's handicap, even though it was likely making reasonable efforts.

Lastly, Winnacunnet argues that the breakdown in cooperation between Leslie's parents and school officials was entirely the parents' fault. The court agrees that Leslie's parents were often uncooperative. However, a major point of contention between school officials and Leslie's parents was whether Leslie would be coded OHI. Winnacunnet's obstinacy in refusing to code Leslie OHI contributed to the breakdown in cooperation. Leslie's parents thus were not entirely at fault.

23

Having concluded that Leslie's IEP was inappropriate, the court may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Generally, the school district would be liable for the entire costs of out-of-district private school placement. However, in this case, Leslie's parents were partially at fault for rendering Leslie's IEP inappropriate. Thus the court finds that the appropriate relief here is for Winnacunnet to pay half of Leslie's private school placement and for Leslie's parents to incur the other half of those costs.

Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied. The School District shall within sixty (60) days of the date of this order make appropriate arrangements for the reimbursement to Leslie's parents of fifty (50) percent of the cost of Leslie's private school tuition. The clerk shall enter judgment in accordance with the provisions of this order.

SO ORDERED

_____
Shane Devine, Senior Judge
United States District Court

April 9, 1998
cc:   Leslie B., pro se
      Barbara F. Loughman, Esq.

24